Good morning, your honors, and may it please the court. My name is Kathleen Shen and I represent the appellate, Mr. David Ansberry. The district court made three errors in calculating the guidelines in this case. Altogether, these errors increased Mr. Ansberry's advisory guidelines range tenfold. I'm going to focus my argument today on the two most consequential of those errors, which involve the substantial risk and terrorism guidelines. The substantial risk guideline in section 2K1.4a1 applies when the offense, quote, created a substantial risk of death or serious bodily injury and that risk was created willingly. By its plain language, the guideline requires the actual creation of risk. That's how this court interpreted materially identical language in section 3C1.2. In United States v. Young, this court held that the guideline and that language applies, quote, only when a defendant actually creates a substantial risk. The district court, however, interpreted the guideline to concern the defendant's state of mind and when he acted so that it could be satisfied by the defendant's intent or attempt to create a substantial risk.  The guideline language does not refer to the intent or attempt to create a risk. It refers to the actual creation of risk, and the conclusion that the guideline doesn't reach mere attempts is bolstered by the fact that other provisions of the same guideline expressly do cover attempts. Judge Lucero, in the Boston Marathon bombing, for example, if the bomb simply did not go off but would have created substantial risk if it had, that, of course, would comply with our jurisprudence. How do we make the distinction between the situation where the bomb simply doesn't go off and a bomb is incapable of ever going off? I mean, it seems to me that that presents a factual question that calls for experts to opine upon whether the device in question created the risk or not. How do we make that determination? Your Honor, the judges would make that determination just the same way that they would make any other complicated factual determination, and the way that the government attempted to prove... But it is an evidentiary determination, is it not? The question of whether the bomb in fact created a substantial risk is a question of fact. That's right. So in order to meet the standard, the government would have to prove through whatever evidence was available that there was in fact a high probability that the bomb would have exploded in a manner that was capable of injuring or killing people. What does the record tell us on point? So in this case, there's a lot of things that are said over the course of the hearing, but if you look at what the judge actually says when she applies the guideline, you'll see that she sets out this legal standard and says specifically that it only requires proof of the defendant's state of mind and that the fortuity that the device failed doesn't matter. And then when she rules that the guideline applies on pages 396 to 98 of Volume 8 of the record, she finds that it applies because Mr. Ansboury used HMTD and that he knew that HMTD had the potential to be very dangerous and that he knew of the potential risk posed by HMTD. Critically, she doesn't find that HMTD was actually present in sufficient quantities or at a sufficient sensitivity to explode in a dangerous manner. In fact, throughout the hearing, she says the opposite, that Mr. Ansboury was incapable of cooking quality HMTD and that this particular HMTD, which was in the device, was too degraded to explode. This is Judge McHugh. Let me interrupt you. The court found at 397 and 98 that Officer O'Nallion unknowingly picked up the bomb, was at risk of death or serious bodily injury when he did this. She made a specific finding that he was at risk. And then there was also testimony not only from the government's experts, but also from the defense expert that it was only fortuitous that this bomb didn't go off and that it was capable of going off. How do you respond to that? I have a couple of responses. So I think I'm going to start with what the defense expert says because I think it really illustrates the sort of central confusion that you see in this record. The defense expert said that this bomb could have killed people if it had been packed with enough HMTD. And he, you know, at first when he's talking about, of course this bomb could kill people, it could go off within 75 feet, I wouldn't want to be with it. But then he says, I mean, it could do that if it had been packed with high quality HMTD. And nobody says that it was. And so, you know, that sort of, so when the defense expert said it could kill people, he means it could have killed people if it had in fact contained the right quantity and the right type of explosive. But, you know, based on all the other, the actual experience of the bomb squad, the defense expert says, you know, it clearly didn't. And when the, so when the district court says, you know, when Mr., when Officer Inalian picked up the device he could have been killed, what she's saying is, you know, he picked up a device that was intended to be dangerous and that Mr. Ansboury created with the intention that it was dangerous. But she also says that the actual explosive in the device was too degraded to explode. And our position is that in order to satisfy... It was too degraded to explode because the bomb squad eventually got it to explode. Right. And it shredded the sandbags. So it was too degraded to explode without being shot by a lead. And so there wasn't evidence that the bomb could have exploded when Officer Inalian picked it up. Now, the government put in a lot of evidence that HMTD, when it is made correctly, is really sensitive and so could explode, you know, from the slightest impact, such as someone picking it up or kicking it. But we know that this HMTD was not, in fact, that sensitive because the bomb squad, in this case, actually jostled the HMTD. They swung it. The bomb, they picked it up. They swung it around. They dropped it on the ground. They shot it with a laser and they left it in the sun for hours. And nothing happened to the bomb. And so between the failure of the bomb to explode initially and the failure of the bomb to explode over the course of the day, that's evidence that the HMTD in this device was, in fact, too insensitive to explode when Officer Inalian picked it up. And the district court actually says that it was too insensitive to explode under those conditions. And I think that's consistent with the evidence that was presented in this case. And so what the guideline would require is evidence that there was, in fact, a high probability that when Officer Inalian picked it up that the device could have gone off and killed him, but that's not the evidence that we have here. Well, that's not the customary, Judge Lucero. High probability is not the standard. The general standard in any case involving professional witnesses is a probability based upon scientific probability and not some hypothetical theoretical standard. What standard should we apply? Shouldn't it be the latter? I'm sorry. I'm not sure I understood the question. That's all right. If you don't understand the question, it's okay. Sorry. Don't worry about it. So to be clear, when I say high probability, I mean I'm saying what the legal standard, substantial risk requires is some evidence that there's a high, not some evidence, a preponderance of an evidence that there's a high probability that this device would have exploded and injured somebody in this case. And given the evidence that the device didn't contain a sufficient quantity of sensitive HMTD, the district court couldn't make that finding and didn't make that finding here. I think it's also important to note that the government actually wasn't able to say how much of the explosive HMTD there was in the device. While they had evidence of the volume of the container, they said they didn't have any idea of the density and they couldn't say that everything in the device was actually HMTD. And so for that reason, you know, I think when you read the record, the best way to read it. Well, you have other guidelines. Judge Listero, you have other guidelines that are implicated here. Not a great deal of time. Could we hear from you on some of the other guidelines? Sure. The official victim, terrorism, substantial risk. Of course. I'll just start with the terrorism guideline because it made such a big difference in this case. You know, the terrorism guideline is uniquely harsh. Here, I think it increased Mr. Ansboury's advisory guideline range from 51 to 63 months to 324 to 405 months. I know I said 70 to 87 in my brief, but I think I forgot to account for acceptance of responsibility. So this is the difference of a sentence of four years versus 27 years. And in this case, the district court applied the guideline on the ground that the offense was calculated to retaliate against government conduct, and specifically she found it was retaliation for the murder of Guy Goffner. But she refused to find that that murder was government conduct. And these findings are insufficient as a matter of law. The guideline doesn't reach retaliation against non-government conduct. The plain language of the statutory definition incorporated in the guidelines says it reaches conduct that is calculated to retaliate against government conduct. And we know that non-government conduct isn't reached by the guidelines because the commission felt it was necessary to enact an upward departure provision covering some conduct that targeted at the civilian population. So there's an upward departure in application 04 that covers conduct where the motive was to intimidate or coerce a civilian population rather than to influence or affect the conduct of government or retaliate against government conduct. So, you know, this would cover someone who bombs an abortion clinic, for example. This is Judge McHugh. I've got two questions about this. The first is we've got an issue about preservation that I'd like you to address. And the second is whether it's actually government conduct or whether the defendant thinks it's government conduct and is retaliating against what the defendant perceives to be government conduct. So with respect to your first question, you know, this issue was preserved. It's raised in pleadings before sentencing. It's raised again during the sentencing argument. You know, defense counsel actually tried to solicit evidence on this when they were questioning the case agent, I believe. And then, you know, so it's raised before the judge applied. You know, the judge actually rules on it. The judge says, you know, and I'm applying this even though I don't find that this is government conduct or I'm not finding it's government conduct. Thank you, counsel. Judge Lucero, unfortunate use of you know, you know, you know, because, of course, the point of the argument is that we don't know and want to hear your points on these matters. But we'll grant some additional time for you at rebuttal. But let's hear from the appellee at this point.  I'm Marisha Miller, and I represent the United States. I think I'd like to start by addressing the disagreement between the defendant and the government over what the district court actually found with respect to this bomb. So here are some sites for the record that I think are helpful for this court to see where the district court made clear that it believed this bomb was actually dangerous and not just potentially dangerous. So at volume 8, page 378, the court says that every expert rejected the idea that the device was incapable of exploding. Page 382, it says this was a real bomb that would have caused damage if it went off. Page 384, it says this bomb was capable of going off. In volume 9, at page 9, the court describes the bomb as having enormous explosive power. And then on page 37 of volume 9, it says the bomb killed someone. Counsel Judge Lucero, weren't those comments hypothetical in nature, having tremendous explosive power? Well, yes, if constructed the way the bomb in the judge's mind would have been properly constructed. But aren't we dealing here with a question of fact? I mean, in fact, this bomb was highly stable rather than being unstable as a bomb should, I guess, be. It took extraordinary effort to get it to go off. And when it did, because of the degraded nature of the active ingredient, the force of the bomb was, as you know, the amount that was in the record and not the hypothetical amount that the judge is talking about. So how do we make that determination based upon device that is in front of us or this hypothetical device that the sentencing judge described? Yes, Your Honor, I have two responses to that. And the first is that while this bomb might not have been as powerful as it was designed to be, we can see from the explosion that actually occurred, and more importantly, all of the experts who testified about the power of the explosion that actually occurred, that even then it was still a bomb that was capable of killing someone. I know there's a dispute about this, and so I'll just give the court the record site. But at Volume 8, page 326, I think the court asked the defense expert pretty explicitly about the bomb in question. And the defense expert says, you know, I wouldn't have wanted to be holding that bomb because the person holding it probably would have died. And he also says, I wouldn't have wanted to be near it because there still would have been shards of glass from the mason jar. But with respect to the stability of the bomb, because I think that that is an important question, I want to focus specifically on the HMTD and also, really importantly, the first responders. Because in this appeal, the defendant is really trying to relitigate the question of the bomb's capabilities, and I don't even think the court has to address that, and here's why. The HMTD alone made this bomb a danger to anyone who encountered it. It's a high explosive that's in the same category as TNT and C4. And as one of the experts said, there's no such thing as a safe amount of HMTD. But more specifically, we have to think about the very real, very dangerous situation that the HMTD's presence created for the first responders. And that's because the bomb squad clearly couldn't just leave this bomb outside the police station in the middle of the shopping center. But because of the dangers of HMTD, they couldn't pick it up and drive away with it either because that would have been just as dangerous. So we have to think of this bomb. Counsel, thank you. We ran out of time on the others, and I don't know about my colleagues, but I have concerns about the terrorism guideline. I have concerns about the official victim guideline, and I just want to give ourselves time to discuss those. On terrorism specifically, what was the government conduct that the defendant is allegedly retaliating against? As I understood, the retaliation that he was engaging in was against the conduct of a certain individual named Gagner or Deputy Dog. And was he a government official? Because my understanding is that he was not. Yes, Your Honor. So while the victim of that murder was not a government official, the defendant was retaliating against Deputy Dog's murder by the town marshal at the time. And that's an important part of the story because it's not just that the town marshal had some sort of personal dispute with his friend. What happened was the town marshal is called to a bar fight in his capacity as a police officer. He arrests Deputy Dog. He puts him in his patrol car. And then, of course, he does this egregious thing where he – we don't know why. There's a claim by the town marshal who's long since dead that Deputy Dog lunged at his weapon. But the town marshal shoots Mr. Ansboury's friend and leaves him in the mountains. This is still in the queue. One of the problems you have, that's an argument that this might be government conduct. But the district court specifically refused to make a finding about whether or not the town marshal was acting within the scope of his duties as town marshal when he executed Deputy Dog. And, you know, I think you can make a pretty good argument that he wasn't. Don't we – I mean, at the very least, don't we have to remand to get such a finding one way or the other? Two responses to that, Your Honor. First, if we look at the plain text of this guideline, it doesn't actually require that what's being retaliated against is objectively government conduct. What's important is the defendant's subjective state of mind. Well, it doesn't say that either, does it? It doesn't say subjective. Well, so if you go to the federal terrorism statute, it's 18 U.S.C. 2332B, and that's what this enhancement is based on. It's divided into two sections. One is this enumerated list of crimes, and that's very clearly the actus reus. And then the second part is essentially the mens rea, which is calculated to coerce, intimidate, or retaliate, which means that's the terrorist's state of mind. Retaliate against government conduct. Sure. So let me try my second argument on you, Your Honor. I would direct the court to volume one, pages 348 to 351, which is a letter from Mr. Ansboury explaining why he did this. And in his manifesto, while he talks about the murder of his friends, he also talks about a lot of different incidents over the years where law enforcement killed unarmed civilians, usually young people, including the incident with the National Guard at Kent State, as well as more recent events like what happened with the police in Ferguson. And given this letter, it seems clear that the defendant was motivated by an anti-government ideology. And I think that, again, I think it goes back to whether it's even important for purposes of terrorism, whether this was objectively government conduct. And so I guess I have a few examples that go to that. One is we can imagine that someone bombs the CIA because he believes that the CIA assassinated JFK. That, to me, seems like a fairly clear cut of unlawful violence against the government. Would the government have to prove that the CIA assassinated JFK in order to say that that defendant was, his crime was calculated to retaliate against government conduct? And then I think the second point I want to make is the defendant is implicitly arguing that this murder wasn't government conduct because a police officer is not acting in the course of his duties. Counsel, Judge Lucero, I know you have a lot of points to make, but please pause a little bit now and then. Let us get a word in edgewise here. The district court, I read her finding, did not make a finding that Ansboury retaliated against government conduct. Do you find such a finding? And if so, would you direct us to it, please? No, Your Honor, the district court did not make that finding. The district court rather made a finding of law that the statute doesn't require proof that it's objectively government conduct. Rather, the district court agreed with what the government is arguing now, which is that if you look at the plain text and the structure of the statute, it's the mental state of the defendant. And whether he believes that he was retaliating against government conduct rather than whether or not it was government conduct objectively, that's key. On the issue of official victim, who is the victim that we are addressing our attention to? Yes, Your Honor. I think the best or clearest victim would be police officer O'Nallen, who picked up this bomb and brought it into the police station. And while no one was obviously hurt by the defendant's actions, which was very lucky, police officer O'Nallen talked about the trauma that he experienced from this. And as we see from terrorism statutes and in other areas of the law, a victim doesn't have to be physically injured to be injured by a defendant's conduct. And especially if you look at the Polk case from the Fifth Circuit that's cited in our brief, you don't even have to point to a specific person. As long as the defendant attempted to blow up a government building, all of the government officials inside of it are considered victims for purposes of the official victim. I want to return to this issue of the first responders because, again, I do think it can be really helpful to the court because the court doesn't have to think about whether the bomb was capable of exploding. So we have this situation where we have a bomb that's like a grenade that's had the pin removed and it hasn't gone off yet. And the bomb squad only has one option at this point. It has to allow the HMTD to go ahead and explode. This was something they were forced to do and they were put in this dangerous position by the defendant. At the same time, all of the experts testified about the dangers of the explosion that occurred at that point. Not the dangers of any potential explosion if the defendant had created an incredibly effective bomb, but the dangers of the actual explosion. And they all said that anyone within 25 feet of that bomb could have died. So we have to remember that the defendant, by choosing to build a real bomb and putting HMTD, this incredibly dangerous substance in there, and then leaving it where he did, the defendant put the first responders into a situation that everyone below agreed could have turned deadly. And the only reason it didn't was because the defendant got lucky and the bomb squad did their job well. Counsel Judge Lucero, is this a matter of luck or is this just a matter of a bungled effort to manufacture a bomb that just didn't have the necessary ingredients to ever be a bomb without extraordinary efforts that the record demonstrates went through to actually get it to do whatever it ultimately did? Well, I think there are a few responses to that. One would be that if you look at the record, actually the FBI's experts testified that the fact that the bomb didn't detonate on its own before the bomb squad arrived, we can't actually infer that much about how stable the bomb was. Several of the experts, they say that's kind of the nature of HMTD. You know, you can drop it once and you can get lucky and it won't explode, but the next time you touch it, it will explode. And so while we know here that the HMTD was somewhat degraded, we really don't know that the bomb wasn't capable of exploding on its own. Thank you, Counsel. We understand your argument. We appreciate your time. Judge Ide and Judge McHugh, with your consent, I'll grant two minutes of additional time to the defense counsel to make her case. Is that okay? It's fine here. Here, me too. All right. Thank you, Your Honors. Two minutes, please. Hi, Judge. Sorry. So I guess briefly, I also want to talk about this idea of risk more generally because I do think that that is at the heart of this question. And ultimately, the defendant claims that risk is something that we evaluate after an event has already occurred when we have all of the information about how things ultimately played out. And I think that kind of goes to this question of luck that you're talking about. And that's how the defendant argues that we should analyze risk here with this benefit of 20-20 hindsight. But that's not normally how we do this. And so, I mean, we can think of the case with Honeycutt where someone tries to ignite this extremely large fire and the reason that it doesn't work is because of the sprinkler system. And we can say that's luck or we can compare it to what happened here where we can say maybe the defendant in Honeycutt wasn't actually a great arsonist because they should have turned off the sprinkler system. Just like we can say, well, maybe Mr. Ansboury wasn't the best bomb maker because he, you know, should have created more pure ASEM CD. But ultimately, that's not what matters for the purposes of risk. When we talk about risk, we're talking about the scope of risk before the fact. So, I mean, another example is a drunk driver gets behind the wheel of the car, crosses the yellow line, and is driving in the wrong direction at 90 miles an hour. I think we all agree that that's a crime that creates a substantial risk of death or bodily injury. And if the defense gets up and says, you know what, there was no one else on the road at the time, the defendant was really lucky, I don't think that changes the analysis because risk isn't something we think about after the fact. When we have all of the information, we have the benefit of 20-20 hindsight. So what matters here is that we have a defendant who put a very real bomb, not a hoax bomb, a bomb made with ASEM CD, which we saw exploded, which the experts, even in those quantities, even degraded, testified could kill someone. He placed it outside a police station. He put it in a public plaza when it didn't detonate. And I think it's hard not to come to the conclusion that that crime created a substantial risk of death or serious bodily injury. With that, I would respectfully ask the court to affirm.  Mr. Heron, is there remaining time on the clock? That is the time expired, Judge. Thank you kindly. Counselor excused. The case is submitted. Sorry. Mr. Heron, if you will call the next case, please. Apologies, Your Honor. Excuse me, excuse me. No, that's all right. Judge Lucero, I think we just heard more argument from the United States and that defense counsel hasn't had a rebuttal yet or maybe I'm confused. Judge McHugh, I think you're absolutely correct. And that's why I asked Mr. Heron if there was time because I had granted two minutes additional to the appellant. Mr. Heron? Mr. Heron? Hello? Judge, I'm sorry. We're having a technical difficulty. That was Ms. Shen just arguing, correct? We are unclear. The argument, I agree with Judge McHugh, it sounded like government argument from my perspective, but I don't know who was making it. Ms. Shen, were you just arguing? No, Your Honor. That was Ms. Miller for the government. Okay. I'm very sorry. Yes, I'm sorry. Ms. Shen does have two minutes. Ms. Shen actually has three minutes. I was going to give her two as the government took them, so that's all right. My apologies, Judge. Two or three minutes, counsel. My apologies, Judge. I'll put three minutes on the clock. Not to worry. Not to worry. All right. Just to respond to a few of the points the government made… Introduce yourself. Introduce yourself, please, and then you can argue it. Thank you. This is Kathleen Shen on behalf of Mr. Ansboury. So, first, to continue, the terrorism guideline doesn't cover merely perceived government conduct. And, you know, Congress knows how to criminalize improper motives that are based on mistaken perceived facts. For an example of that, you can look at the hate crime statute or the hate crime guideline. And I'd also point out there's no cases where the terrorism guideline's been applied based on non-government conduct. And to the extent that the guideline is ambiguous, this court should construe it in a manner that is more favorable to Mr. Ansboury. I'd also say the district court didn't actually find that Mr. Ansboury committed the offense out of any anti-government ideology. So this court shouldn't make that finding on appeal. And just as a general matter, it's really hard to define what is or isn't terrorism. And the government points to some examples of things that seem like maybe they should be terrorism but might not fall under the guideline. And given that this is a hard line to draw, the court should defer to how Congress has defined terrorism, especially because the consequences of finding that this meets the federal definition of terrorism are so severe. On the official victim enhancement, the offense of conviction was not leaving the device in the plaza after it failed to detonate for Officer O'Neillian to pick up. The offense of conviction was attempting to set off the device at around 5 in the morning. And because the official victim enhancement only concerns the offense of conviction, it doesn't apply here. And just to return to the... Can we look at the indictment? This is Judge McHugh. Can we look at the indictment that he pled guilty to? You can look at the indictment and you look at the plea hearing. And in this case at the plea hearing, he pled guilty to use... The facts are set out in my brief. He specifically pled guilty to attempting to set off this device at 4.55 to 5.15 in the morning. And he pled guilty under the property element of the statute. And then on the substantial risk guideline, the quantity of the dangerous substance matters. It's not enough just to say that the offense involved a dangerous substance and therefore the guideline is met. The Seventh Circuit case in Smith is a really good example of this. The quantity matters. The circumstances matter. It's not enough just to say that HMTD involved and therefore there was a substantial risk of death. And also the district court didn't find that or didn't apply this guideline because of the danger to first responders. And that's another finding that this court shouldn't make for the first time on appeal. Let me ask you, this is Judge McHugh again, looking at the terrorist statute, the sub-A that says, it's calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct. What about the first part of that, the influence or affect the conduct of government by intimidation or coercion? You don't need government conduct there, do you? No, but the district court didn't apply that prong. She did restate the whole statutory language when she applied the guideline, but it's clear that it was specifically based on the retaliation part of the statute. Thank you. Thank you. Judge Ide, did you have anything?